# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARHSALL DIVISION

| | |
|---|---|
| **MPI CORPORATION** | |
| **Plaintiff,** | |
| **v.** | **Jury Trial Demanded** |
| **TECHNOPROBE S.P.A.,** | **Civil Action No. 2:26-cv-305** |
| **Defendant.** | |

## COMPLAINT FOR
## PATENT INFRINGEMENT

Pursuant to the Federal Rules of Civil Procedure, MPI Corporation ("MPI") files its Complaint for Patent Infringement against Defendant TechnoProbe S.p.A. ("Defendant"), showing this Court as follows.

### NATURE OF THE ACTION

1.      This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. §§ 271, *et seq.*, to obtain damages resulting from Defendant's unauthorized and ongoing actions, in the state of Texas and elsewhere, of making, having made, using, selling, having sold, offering to sell, importing and/or having imported into the United States integrated-circuit testing cards that infringe one or more claims of MPI's U.S. Patent No. 9,423,424, entitled "Current-Diverting Guide Plate For Probe Module And Probe Module Using The Same," ("the '424 Patent") and U.S. Patent No. 9,823,272, entitled "Wafer Testing Probe Card," ("the '272 Patent"). The '424 Patent and the '272 Patent are collectively referred to as the "Asserted Patents" and copies of these patents are attached hereto as Exhibits 1 and 2, respectively.

2.      This action arises from Defendant's infringement of one or more claims of the Asserted Patents. Defendant makes, has made, uses, sells, has sold, offers to sell, imports, and/or has imported into the United States certain integrated circuit testing devices that infringe one or more claims of the Asserted Patents, either literally or under the doctrine of equivalents.

### THE PARTIES

3.      Plaintiff MPI is a corporation organized and existing under the laws of Taiwan and owns all right, title, and interest in and to the Asserted Patents, including the right to seek damages for infringement.

4.      Founded in 1995, Plaintiff MPI is a world-leading innovator and manufacturer of testing systems for integrated circuits, including probe cards and systems, RF and mmWave platforms, high-power platforms, and optoelectronics platforms. With its headquarters in Hsinchu, Taiwan, MPI is a global company with over 1900 employees, including offices through a wholly-owned subsidiary in the U.S. Since 2009, MPI has been awarded over 120 U.S. patents for its probe card technology.

5.      Upon information and belief, Defendant is a publicly-traded Italian corporation with its principal place of business at Via Cavalieri di Vittorio Veneto 2, 23870 Cernusco Lombardone (LC), Italy.

### JURISDICTION AND VENUE

6.      This action arises under the patent laws of the United States, including 35 U.S.C. §§271, 281, and 284-285.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1338(a).

8.      This Court has personal jurisdiction over Defendant, as Defendant has contacts with Texas and this judicial district, it has purposely directed activities toward Texas and this

judicial district that give rise to the causes of action herein, and it has purposefully availed itself of the privileges of conducting business in Texas and this judicial district. For example, upon information and belief, Defendant has sold or offered for sale products, including the Accused Products, and provided support for such products to its customers within this district, including, but not limited to Texas Instruments Incorporated. Through its activities in this district, Defendant has committed acts within this district giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

9.    In the alternative, this Court has personal jurisdiction over Defendant under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise under federal law, Defendant is not subject to the jurisdiction of the courts of general jurisdiction of any state, and exercising jurisdiction over Defendant is consistent with the U.S. Constitution.

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(c)(3) because, among other things, Defendant is not a resident of the U.S.

### BACKGROUND AND THE ASSERTED PATENTS

11.    An integrated circuit die is comprised of one or more circuits that include numerous electrical components, such as transistors, formed on a semiconductor wafer. These components are ordinarily formed on the wafer through lithographic and epitaxial processes. A single wafer may include thousands of dies.

12.    Once manufactured on the wafer, each individual die is separated from the wafer and undergoes a process known as packaging, where the die is mounted onto a substrate or frame, its input/output terminals are connected to the package leads, and the frame and its die are encapsulated in a coating to protect against corrosion and physical damage. In certain

3

applications, packaging also includes combining multiple logic and memory dies on a silicon interposer or stacking multiple logic and memory dies through hybrid bonding.

13.     In the past, each die was tested either during the packaging process or after the packaging process was completed. However, this approach was inefficient and expensive, with dies from the same wafer undergoing individual testing and after the additional expenses of the packaging process. Moreover, manufacturers often completed this testing by manually touching needle-like probes to various portions of the die to perform parametric and functional tests.

14.     To address this issue, manufacturers developed wafer probing. Wafer probing allows the manufacturer to identify a known good die ("KGD") before packaging. Dies that fail electrical, parametric or leakage tests are marked and excluded from packaging process. The wafer sits on a precision probe station, and a customized probe card connects thousands of microscale probes to the die's contact pads and/or micro bumps.

15.     The probe card, often a MEMS fabricated array built through semiconductor processes, acts as an interface between an automated testing unit and dies. The testing unit sends a series of electrical signals through the probe card to the die, applying voltage, logic vectors and timing patterns to verify the die's functionality.

16.     Current probe stations also integrate environmental temperature control. Data from wafer-level tests feeds into predictive analytics models that estimate die reliability and performance binning, which is critical for allocating high bandwidth memory and logic dies during assembly. Once KGDs are identified, they move into packaging where, through integration, the resulting chiplet module becomes an even more complex electrical and thermal system.

17.    Nearly every die design has a unique layout of contact pads (the metal contact points on the surface of the die) and micro bumps (the small raised conductive structures deposited on a die to create electrical, thermal, and mechanical connections). These contact pads and micro bumps provide electrical pathways for signals and power and physically connect the die to its PCB.

18.    A single die may contain over 20,000 contact points at bump pitches below $45\mu m$, carrying hundreds of amps across multiple power domains. The probe card must maintain sub-micro planarity and stable contact resistance across millions of touchdowns. Even minute mechanical drift can cause errors such as open contacts or short circuits.

19.    Accordingly, each probe card must be customized for a specific die, including mapping of the probes to specific die layouts, pad sizes and contact forces, as well as modifications to power requirements and frequencies to reduce noise while optimizing signal integrity.

20.    While individual probe cards are designed for a specific die, manufacturers of these probe cards utilize product line names to market their probe cards that include common high-level design elements. For instance, a picture of one of MPI's Osprey-line probe cards is set forth below.



21.     As an example, MPI's Osprey-line cards share certain common design elements, including a round printed circuit board ("PCB") base, micro-electrical mechanical systems ("MEMS") coated probe needles, and the ability to test down to 35-micron pads (the area on the IC contacted by the probe needle) and down to 40-micron device pitch (the distance between pads). However, as noted above, the Osprey-line cards are modified to test the specific die design.

A.  The '424 Patent.

22.     MPI is the owner of all rights and interests, including the right to sue for infringement, in the '424 Patent.

23.     The inventors of the '424 Patent recognized that, as dies were becoming smaller, the diameters of probe needles correspondingly needed to become smaller. However, as the diameter of the probe needles diminished, existing probe cards suffered from several drawbacks, including failures of probe needles due to unexpected excessive current, e.g., instantaneous overcurrent.

24.     The invention disclosed in the '424 Patent provides, among other things, a novel current diverting guide plate to protect probe needles by diverting unexpected excessive current.

25.    Claim 1 of the '424 Patent is illustrative, providing:

1. A probe module comprising:

an upper guide plate including a plate body that has a first surface, a second Surface opposite to the first Surface, and a plurality of through holes penetrating through the first and second surfaces;

a lower guide plate spacedly disposed beneath the upper guide plate, the lower guide plate comprising:

a plate body having a first surface, a second surface opposite to the first surface, and a plurality of through holes penetrating through the first and second surfaces; and

a current-diverting circuit trace disposed on the first surface of the plate body of the lower guide plate; and

a plurality of probes each slidably inserted through one of the through holes of the plate body of the upper guide plate and one of the through holes of the plate body of the lower guide plate in a way that the probes each have a probe tip disposed beneath the lower guide plate and the probes are elastically deformable between the upper and lower guide plates when the probe tips contact a device under test;

wherein at least two of the probes 22 are electrically connected with the current-diverting circuit trace 50 of the lower guide plate 30';

wherein the lower guide plate further comprises a plurality of conducting layers each provided at a periphery wall of one of the through holes of the plate body of the lower guide plate and electrically connected with the current-diverting circuit trace of the lower guide plate.

26.    U.S. Patent Publication No. 2014/0197860, which ultimately issued as the '424 Patent, is identified as a reference cited on the face of U.S. Pat. No. 11,035,885 owned by Defendant.

B.   The '272 Patent.

27.    MPI is the owner of all rights and interests, including the right to sue for infringement, in the '272 Patent.

28.    The inventors of the '272 Patent recognized that existing probe cards suffered from significant drawbacks in probe life and reliability due to the interaction between the cards' probe needles and the IC being tested.

29.     The invention disclosed in the '272 Patent provides a novel improved design for a probe card that overcomes these drawbacks.

30.     Claim 1 of the '272 Patent is illustrative, providing:

1. A wafer testing probe card, comprising:

a printed circuit board;

a flexible circuit board having peripheral portions electrically connected to the printed circuit board and collectively defining an accommodation space, and the flexible circuit board having an upper surface and a lower surface;

an elastic piece disposed within the accommodation space defined collectively by the printed circuit board and the flexible circuit board; and

a probe unit, comprising:

a probe head fixed on the printed circuit board and having a plurality of through holes; and

a plurality of probes respectively passing through the through holes, wherein the probes in direct contact with the lower surface of the flexible circuit board with the support of the elastic piece against the upper surface of the flexible circuit board when the probes moves toward the flexible circuit board, thereby enabling signals to be transmitted from a device under test to the printed circuit board via the flexible circuit board and the probes; wherein

as the probes moves toward the flexible circuit board, the elastic piece absorbs the forces of the probes transmitted through the flexible circuit board; and

the elastic piece and the probes are physically spaced from each other by the flexible circuit board such that the elastic piece is incapable of contacting the probes.

**DEFENDANT'S INFRINGING ACTIVITIES**

31.     MPI has learned that Defendant has offered for sale and, upon information and belief, continues to offer for sale certain probe card product lines that MPI's investigation indicates infringe certain claims of the '424 Patent and the '272 Patent.

32.     Defendant disclosed the design of its HiP Architecture probe card line(s), shown below, at the SWTest Conference in 2023. Technoprobe's probe card products in the HiP Architecture probe card line(s) are collectively referred to as the "'424 Accused Products." The features and functionality of the '424 Accused Products were further discussed in the article

High-Speed Probe Card Architecture for High-End Devices, Chip Scale Review, v. 27, n. 6, pp. 29-37 (Nov.-Dec. 2023).



33.　　The '424 Accused Products meet each limitation of at least Claim 1 of the '424 Patent. A claim chart mapping each limitation of Claim 1 of the '424 Patent to the '424 Accused Products is attached hereto as Exhibit 3.

34.　　To the extent that any product in the '424 Accused Products may not meet any limitation of Claim 1 of the '424 Patent literally, such limitation would be met through a proper application of the doctrine of equivalents.

35.　　Similarly, Defendant disclosed the design of its Phantom probe card line(s), shown below, at the SWTest Asia Conference 2024. The Phantom Probe card line(s) are collectively referred to as the "'272 Accused Products."



Phantom PH

36.     The '272 Accused Products meet each limitation of at least Claim 1 of the '272 Patent. A claim chart mapping each limitation of Claim 1 of the '272 Patent to the '272 Accused Products is attached hereto as Exhibit 4.

37.     To the extent that any product in the '272 Accused Products may not meet any limitation of Claim 1 of the '272 Patent literally, such limitation would be met through a proper application of the doctrine of equivalents.

38.     MPI maintains a virtual patent marking website, confirming that one or more products may practice the inventions disclosed in MPI's U.S. and international patents. Among other patents, the MPI website identifies the '424 Patent.

39.     MPI has marked its products with the '424 Patent in compliance with 28 U.S.C. §287.

40.     Upon information and belief, Defendant has known of the existence of the '424 Patent since at least its issuance, as Defendant cited the '424 Patent's publication during Defendant's prosecution of a similar patent.

41.     Further, Defendant attended the 2024 SWTest Asia Conference at which a partner of MPI provided a Friday Keynote Presentation entitled "New Wafer Testing Challenges for

Leading-Edge SoC Products," during which a slide cited the '424 Patent (highlighting added below for ease of reference).



42.    Upon information and belief, one or more of Defendant's representatives attended this Friday Keynote Presentation.

43.    At a minimum, Defendant has known of the existence of the '424 Patent at least as early as the filing date of this Complaint.

44.    Upon information and belief, since at least the date Defendant was first on notice of its infringement, Defendant has actively induced, under §271(b) of the Patent Act, importers, distribution partners, reseller partners, and customers that import, distribute, purchase, offer for sale, sell, or use the '424 Accused Products to directly infringe one or more claims of the '424 Patent by using, offering for sale, selling, and/or importing the '424 Accused Products. Since at least the notice provided, Defendant has done so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '424 Patent. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, reseller partners, solution partners, consumers, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the '424 Accused Products, creating and/or maintaining established distribution channels for the '424 Accused Products into and within the United States,

distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to purchasers in the United States.

45. At a minimum, Defendant has known of the '272 Patent at least as early as the filing date of this Complaint.

46. Upon information and belief, since at least the date Defendant was on notice of its infringement, Defendant has actively induced, under §271(b) of the Patent Act, importers, distribution partners, reseller partners, and customers that import, distribute, purchase, offer for sale, sell, or use the '272 Accused Products to directly infringe one or more claims of the '272 Patent by using, offering for sale, selling, and/or importing the '272 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '272 Patent. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, reseller partners, solution partners, consumers, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the '272 Accused Products, creating and/or maintaining established distribution channels for the '272 Accused Products into and within the United States, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to purchasers in the United States.

47. MPI's investigation into Defendant's infringement described herein is ongoing and MPI reserves its rights to supplement or modify its allegations of infringement.

48.     All other conditions precedent to the assertion of the claims herein have been satisfied or waived.

**COUNT I**
**DIRECT INFRINGEMENT—'424 PATENT**

49.     MPI incorporates by reference as if fully set forth herein its averments in Paragraphs 1-48, above.

50.     As set forth above, the '424 Accused Products practice at least Claim 1 of the '424 Patent.

51.     Defendant has sold and offered for sale the '424 Accused Products, within the U.S. since at least the fall of 2022, in violation of 35 U.S.C. §271, et seq.

52.     Upon information and belief, Defendant has sold and/or offered for sale the '424 Accused Products within, and/or imported such products into, the U.S., in violation of 35 U.S.C. §271, *et seq.*

53.     MPI has been, and continues to be, damaged by Defendant's infringement of the '424 Patent, in an amount not less than a reasonable royalty, together with interest and costs as fixed by this Court pursuant to 35 U.S.C. §284.

54.     MPI is entitled to recover from Defendant the damages sustained by MPI as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

55.     MPI has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. §285, and MPI is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## COUNT II
### INDIRECT INFRINGEMENT—'424 PATENT

56.    MPI incorporates by reference as if fully set forth herein its averments in Paragraphs 1-48, above.

57.    Upon information and belief, Defendant also has indirectly infringed the '424 Patent by inducing others, including its U.S. affiliate and that affiliate's customers, to infringe directly the '424 Patent.

58.    Upon information and belief, Defendant has taken affirmative actions, directly or through its U.S. affiliate, with the specific intent to cause its wholly-owned U.S. affiliate and the affiliate's customers within the U.S. to use, offer to sell, sell or import into the United States the '424 Accused Products in a manner that infringes at least Claim 1 of the '424 Patent.

59.    Upon information and belief, Defendant has taken these steps, which constitute induced infringement, with knowledge of the '424 Patent and Defendant knew or should have known that such actions, when taken, would directly infringe at least Claim 1 of the '424 Patent.

## COUNT III
### INFRINGEMENT—'272 PATENT

60.    MPI incorporates by reference as if fully set forth herein its averments in Paragraphs 1-48, above.

61.    As set forth above, the '272 Accused Products practice at least Claim 1 of the '272 Patent, either literally or through the doctrine of equivalents.

62.    Upon information and belief, Defendant has sold and/or offered for sale the '272 Accused Products within, and/or imported such products into, the U.S., in violation of 35 U.S.C. §271, *et seq.*

63.    MPI reserves the right to supplement or amend Defendant's products accused of infringing the '272 Patent.

64.    MPI has been, and continues to be, damaged by Defendant's infringement of the '272 Patent, in an amount not less than a reasonable royalty, together with interest and costs as fixed by this Court pursuant to 35 U.S.C. §284.

65.    MPI is entitled to recover from Defendant the damages sustained by MPI as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

66.    MPI has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and MPI is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## COUNT IV
### INDIRECT INFRINGEMENT—'272 PATENT

67.    MPI incorporates by reference as if fully set forth herein its averments in Paragraphs 1-48, above.

68.    Upon information and belief, Defendant also has indirectly infringed the '272 Patent by inducing others, including its U.S. affiliate and that affiliate's customers, to infringe directly the '272 Patent.

69.    Upon information and belief, Defendant has taken affirmative actions, directly or through its U.S. affiliate, with the specific intent to cause its wholly-owned U.S. affiliate and the affiliate's customers within the U.S. to use, offer to sell, sell or import into the United States the '272 Accused Products in a manner that infringes at least Claim 1 of the '272 Patent.

70.    Upon information and belief, Defendant has taken these steps, which constitute induced infringement, with knowledge of the '272 Patent and Defendant knew or should have known that such actions, when taken, would directly infringe at least Claim 1 of the '272 Patent.

## JURY DEMAND

71.     MPI hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

MPI respectfully requests that the Court find in its favor and against Defendant, entering a judgment in favor of MPI and granting the following relief:

a) Finding that Defendant has infringed the '424 Patent as alleged herein;

b) Finding that Defendant has infringed the '272 Patent as alleged herein;

c) Requiring an accounting of all damages sustained by MPI as a result of the acts of infringement by Defendant, including any post-verdict infringement and supplemental damages;

d) A preliminary and permanent injunction against Defendant, its subsidiaries, or anyone acting on its behalf from having made, using, selling, offering to sell, or importing any products that infringe the '424 Patent and '272 Patent and any other injunctive relief the Court deems just and equitable;

e) Awarding to MPI damages under 35 U.S.C. §284, including not less than a reasonable royalty and up to treble damages;

f) Requiring Defendant to pay MPI pre-judgment and post-judgment interest on the damages awarded;

g) Awarding to MPI the statutory costs of this action;

h) Finding this to be an exceptional case and requiring Defendant to pay to MPI its attorneys' fees and non-statutory costs incurred in this action under 35 U.S.C. §285; and

16

i) Awarding MPI such other and further relief as this Court deems just and

appropriate, premises considered.

This 17th day of April, 2026.

Respectfully submitted,

TROUTMAN PEPPER LOCKE LLP

By:/s/ Bryan G. Harrison
Bryan G. Harrison
bryan.harrison@lockelord.com
TX State Bar No. 09112600

Ryan E. Dornberger
Texas State Bar No. 24121388
TROUTMAN PEPPER LOCKE LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
Tel: (713) 226-1200
Fax: (214) 223-3717
Email: ryan.dornberger@troutman.com

600 Peachtree Street NE
Suite 3000
Atlanta, GA 30308

*Counsel for Plaintiff MPI Corporation*